**UNITED STATES of America, Plaintiff,**

v.

**Dr. Louis S. ZWICK and Louis S. Zwick, M.D., Inc., Defendants.**

**No. C 76–23 A.**

United States District Court, N. D. Ohio, E. D.

April 27, 1976.

D. D. Weisberger, Asst. U. S. Atty., Cleveland, Ohio, for plaintiff.

Minor Myers, Akron, Ohio, Leonard P. Gilbert, Cleveland, Ohio, for defendants.

## CONSENT DECREE FOR DECLARATORY JUDGMENT AND ORDER OF PERMANENT INJUNCTION

CONTIE, District Judge.

The Plaintiff, United States of America having filed its Complaint against the Defendants, Dr. Louis S. Zwick and Louis S. Zwick, M.D., Inc., for violations under Title 21, United States Code, Section 828(e) and Section 353, and while said Defendants deny any violation of the aforesaid Title 21, United States Code, Section 828(e) and Section 353, nevertheless, consent to the entry of the following Order:

This Court having examined the Court file, being fully advised in the premises finds that the Court has jurisdiction over the subject matter herein and of the parties hereto as alleged in Plaintiff's Complaint, and finds that the Defendants consent to the entry of this declaratory judgment and order of permanent injunction personally, and by and through their counsel.

The Court further finds that the Defendants by means of order forms issued under Title 21, United States Code, Section 828 obtained anorectic controlled substances through interstate commerce in the amount of 3,886,634 dosage units from October, 1972 through October, 1975 for the purpose of dispensing in the conduct of his medical bariatric practice which involved a substantial number of patients who were being treated for obesity. Further, that the aforesaid medication was in fact dispensed to the Defendants' patients in unlabeled

packets each containing 30 anorectic dosage units of controlled substances, pursuant to his bariatric practice from October, 1972 through October, 1975 which practice continues to the present time.

The Court finds that a legal issue exists as to the circumstances under which it may become unlawful for a physician under Title 21, United States Code, to dispense or prescribe anorectic controlled drugs described therein in the treatment of obesity to a large number of patients whereby the cumulative and accrued affect is that large quantities of controlled anorectic substances are thereby prescribed or dispensed, in that under some circumstances such dispensing or prescribing may be outside the practice of medicine in the treatment of obesity.

To resolve this legal issue it is necessary for the Court to declare the minimum medical diagnostic requirements, tests and procedures and the medically accepted standards that must be met and performed by any physician involved in treating patients for obesity and dispensing of scheduled anorectic drugs which are controlled substances regulated by Title 21 of the United States Code and Title 21 of the Code of Federal Regulations.

IT IS THEREFORE ORDERED, ADJUDGED, DECREED AND DECLARED:

For the physician, the obese patient poses one of the most complex problems he is likely to confront. Obesity itself presents as a spectrum ranging from mildly inconvenient and/or unattractive "overweight" to massive and often lifethreatening excess poundage. Its treatment likewise involves measures ranging from relatively modest dietary restriction to intestinal surgery. Above all, obesity almost invariably involves a complex interplay between physiology and behavior, so that the physician must perforce combine purely physiologic and medical measures with the skills of the psychologist and educator. Largely for this reason there is no "standard" treatment that will serve to manage most obese patients or even a large fraction of them. In each case, treatment must be geared to the specific problems, habits, personality, and life-style of the patient. Therefore, the treatment of obesity requires an eclectic approach by the physician.

■ It is further declared that the minimum medical standards of practice for physicians treating obesity by dispensing and prescribing large quantities of controlled anorectic drugs is not met where they are dispensed and prescribed to a large number of patients as a standard treatment, nor are they met by only taking the pulse, blood pressure, weight, stethoscopic examination of the patient, a five minute personal interview with the physician, a casual concern as to possible dependency or addiction of the patient to anorectic drugs, and the delivery of a recommended diet to the patient on any office visit.

■ The decision to use an anorectic drug in any patient can only be made after evaluation of the patient's needs and the risks which such drugs pose to the patient, and a determination as to whether the benefit from the use of such drugs outweighs those risks.

■ Since no medical authority disagrees over the need to individualize the treatment of obesity, it follows that in a practice where a large number of patients are treated for obesity, there will be significant variations in the approach to treatment. It is prima facie improper for a single approach to be used. It is improper that the prescribing and dispensing of anorectic drugs be included as a routine part of the treatment of obesity. In other words, it is not proper for the physician dispensing and prescribing anorectic controlled drugs to adopt a unitary approach to the treatment of obesity in that no standard approach to treatment exists.

■ The Court declares that the standards of medical practice and other modalities of care and treatment of obesity and the use of anorectic drugs is set forth, including but not limited to, the following publications:

*Obesity in Perspective*, by The Fogarty Conference, sponsored by the John E. Fo-

garty National Center for Advanced Study in Health Sciences, edited by George A. Bray, M.D., National Institutes of Health, October 1–3, 1973, Bethesda, Maryland, DHEW publication NIH 75–708, Superintendent of Documents, U. S. Government Printing Office, Washington, D. C. 20402

*Influence of Obesity on Health*, by George V. Mann, M.D., Vanderbilt University School of Medicine, Nashville, Tennessee, appeared in the July 25, 1974 *New England Journal of Medicine*, pages 178–185, and the *New England Journal of Medicine*, August 1, 1974, pages 226–232

The bariatric standards set forth in the appendix hereto.

*The Management of Obesity*, by Thaddeus S. Danowski, University of Pittsburgh, appeared in the April, 1976 issue of *Hospital Practice*, Volume 11, Number 4.

*Textbook of Medicine*, Volume II, edited by Paul B. Beeson and Walsh McDermott, W. B. Saunders Co., publisher, 1975. The article on obesity is by Professor M. J. Albrink of the W. Va. School of Medicine in Morgantown, W. Va.

*Harrison's Principles of Internal Medicine*, 7th edition, edited by Maxwell Wintrobe and 5 others. McGraw-Hill, publishers, 1974. The article on obesity is by one of the editors, Professor George W. Thorne, of Harvard Medical School, Boston, Massachusetts.

The Court finds that the Food and Drug Administration regulations as set forth in Title 21 of the Code of Federal Regulations, Section 310.504 is well taken as attached hereto and is incorporated by reference as though fully rewritten herein.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Defendant, Dr. Louis S. Zwick and the Defendant, Louis S. Zwick, M.D., Inc., its agents, officers, employees and all persons under its control are hereby restrained and enjoined from violating the within orders of this Court.

# APPENDIX

## STANDARDS OF BARIATRIC PRACTICE

These are minimum standards. Many bariatricians will exceed these basic standards.

### A. Initial Patient Work-up

1. History

An adequate history of each patient shall be taken and recorded. It shall include an evaluation of dietary status, a weight history and a history of mental status. When this is a self fill-in, or computerized history, or one taken by assistants, the bariatrician shall personally evaluate significant positive responses and shall make additional notations where appropriate

2. *Physical examination*
   *By bariatrician or assistant*
   a. Blood pressure and pulse
   b. Weight and height
   c. Skinfold measurement(s) (recommended)
   *By bariatrician\**
   d. Observation of general appearance
   e. Head
   f. Neck
   g. Chest - heart and lungs
   h. Abdomen - examined bare with the patient in a supine position
   i. Extremities

The patient's record shall indicate the status of each of these observations separately.

*\*May be performed under the bariatrician's supervision by paramedics licensed in that state to perform these functions, provided that the physician-patient relationship, as is customary in the locale, is maintained.*

3. Laboratory Work
   a. Blood test for anemia
   b. Urinalysis for sugar and protein - (Optional if blood urea nitrogen and/or creatinine (is) (are) done.
   c. Blood chemistries
      1) Blood sugar following test meal or glucose load. If a single blood sugar is done, the two-hour postprandial blood sugar is suggested.
      2) Uric acid
      3) Cholesterol
      4) Triglyceride
   d. A test specifically designed to determine thyroid function
   e. Additional laboratory work as may be indicated by clinical findings
      (Where feasible, profiles including some or all of these tests in A.3. may yield, at little added cost, additional information on the patient's health status)

4. 12 lead ECG
   a. Required if there is reasonable evidence of present or past significant cardiac disease. In addition, the potential value of doing an ECG should be considered if coronary heart disease risk factors are present; e.g., hypertension, hyperglycemia, and certain classes of hyperlipoproteinemia.
   b. Required prior to initiating therapy, if it includes the use of pharmacologic amounts (for that patient) of medications generally recognized as having significant effects on cardiac activity.

When these laboratory tests, or an ECG, have been done recently by another physician, the bariatrician may utilize these test results, or the ECG, if the same are available and have been personally reviewed by the bariatrician.

5. Patient Counseling

Adequate counseling shall be given to patients on proper eating habits and other aspects of treatment prior to the start of therapy.

When the patient has been referred by another bariatrician, who has done an adequate workup and has forwarded significant findings, relevant portions of the initial workup may be omitted unless such omission is not consistent with generally accepted medical practice in the locale.

### B. Return Visits

The bariatrician shall provide adequate periodic follow-up and counseling for the patient.

### C. Medications

The bariatrician shall weigh the benefits and risks of any medication used. Significant sources of such information include journal articles, experience of colleagues, labeling, textbooks, and personal experience. All of these sources can provide valuable information, but no single source should be used to the exclusion of others.

### D. Maintenance

An adequate program shall be provided for helping the patient to maintain the weight loss that has been achieved.

**§ 310.504 Amphetamines (amphetamine, dextroamphetamine, and their salts and levamfetamine and its salts) for human use.**

**(a) Amphetamine and dextroamphetamine and their salts. (1) Pursuant to the drug efficacy requirements of the Federal Food, Drug, and Cosmetic Act, the National Academy of Sciences-National Research Council, Drug Efficacy Study Group, has evaluated certain dosage forms of amphetamines and other sympathomimetic stimulant drugs intended for use in the treatment of obesity and for other uses. The Academy found that such drugs as a class have been shown to have a generally short-term anorectic action. They further commented that clinical opinion on the contribution of the sympathomimetic stimulants in a weight reduction program varies widely, the anorectic effect of these drugs often plateaus or diminishes after a few weeks, most studies of them are for short periods, no available**

evidence shows that use of anorectic alters the natural history of obesity, some evidence indicates that anorectic effects may be strongly influenced by the suggestibility of the patient, and reservations exist about the adequacy of the controls in some of the clinical studies. Their significant potential for drug abuse was also cited.

(2) In addition to those dosage forms that were reviewed for efficacy by the Academy, other dosage forms of amphetamine drugs are on the market that were not cleared through the new-drug procedures. While certain amphetamines were marketed prior to enactment of the Federal Food, Drug, and Cosmetic Act in 1938, some of the conditions of use subsequently prescribed, recommended, or suggested in their labeling (for example, for the treatment of obesity) differ from uses claimed for the amphetamines before said enactment. Such uses have not been cleared through the effectiveness provisions of the Drug Amendments of 1962 (Pub. L. 87-781 which amended the Federal Food, Drug, and Cosmetic Act). These drugs are very extensively used in the treatment of obesity. The extent of use for such purposes as narcolepsy and minimal brain dysfunction in children is believed to be minor as compared with the total usage of these drugs. Because of their stimulant effect on the central nervous system, they have a potential for misuse by those to whom they are available through a physician's prescription, and their abuse by those who obtain them through illicit channels is well documented. Production data indicate that amphetamines have been produced and prescribed in quantities greatly in excess of demonstrated medical needs.

(3) Pursuant to a notice published in the FEDERAL REGISTER of August 8, 1970 (35 FR 12652), which required the submission of new drug applications as a condition for continued marketing of amphetamines, 106 new drug applications for amphetamines or amphetamine-containing drug products were received. The data submitted in those applications, and data obtained from other sources concerning anorectic drugs, generally supported the efficacy of anorectic drugs.

(b) On the basis of currently available evidence derived from short-term studies, the Commissioner concludes that single drug entity oral dosage forms of amphetamine or dextroamphetamine are effective in the management of exogenous obesity as a snort-term (a few weeks) adjunct in a regimen of weight reduction, based on caloric restrictions, for patients in whom obesity is refractory to other measures. For purposes of this regulation, a mixture of dextroamphetamine and amphetamine is ordinarily regarded as a single drug entity.

(c) The Food and Drug Administration is not aware of data providing substantial evidence of the effectiveness of levamfetamine and its salts and regards these preparations as new drugs requiring approval full new-drug applications.

(d) In view of the well-documented history of abuse of parenteral amphetamines the severe risk of drug dependence, and the availability of safer alternative parenteral drugs which are equally effective for recognized non-anorectic indications, the Food and Drug Administration regards parenteral amphetamines as lacking evidence of safety.